630 F.2d 804
 6 Fed. R. Evid. Serv. 550
 UNITED STATES of America, Plaintiff-Appellee,
v.
Louin Ray BRIGHT, C. E. "Jack" Briggs, Robert L. Harbin,
Jr., Robert E. Harbin, Harvey Hamilton, John
Harter and John Thomas "Bill" Chaney,
Defendants-Appellants.
 No. 78-5472.
 United States Court of Appeals,
Fifth Circuit.
 July 11, 1980.
Rehearing Denied Sept. 15, 1980.
 
 John B. Farese, Ashland, Miss. (Court-appointed), for Bright.
 Mel Davis, Oxford, Miss. (Court-appointed), for Briggs.
 Cecil M. Burglass, Jr., New Orleans, La., for Harbin & Harbin.
 Robert G. Gilder, Southaven, Miss., for Hamilton and Harter.
 Warner Hodges, Memphis, Tenn., for Chaney.
 H. M. Ray, U. S. Atty., Alfred E. Moreton, III, Thomas W. Dawson, John R. Hailman, Asst. U. S. Attys., Oxford, Miss., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before TUTTLE, VANCE and KRAVITCH, Circuit Judges.
 KRAVITCH, Circuit Judge.
 
 
 1
 Harvey Hamilton was elected sheriff of DeSoto County, Mississippi in the 1975 general election. His campaign symbol was a white hat; he campaigned on a platform of honesty and integrity, pledging to "clean up" the county if elected. Nothing could have been further from his true intent or subsequent actions. From his taking office in January, 1976, to his indictment by a federal grand jury in late 1977, Hamilton ran the county as his own fiefdom, extorting payoffs and accepting bribes not to perform the duties he was elected to perform. As is generally the case when a public official is corrupt, others in addition to Hamilton were involved. In this case the cast of cohorts in crime is not large, but their actions pervaded this north Mississippi county for the better part of two years. Most of Hamilton's companions in crime[1] were convicted of racketeering and conspiracy to racketeer. Several were convicted of other charges also. All appeal their convictions. We affirm.
 
 The Cast
 
 2
 Besides Hamilton, this case involves seven men who were indicted and others who were not. Because the scenario as established at trial is complex, a brief introduction to the cast will help in following the drama.
 
 
 3
 John Harter is a close friend of Hamilton. Their friendship has extended over many years and continued after Hamilton was elected sheriff. Though Harter's job as a salesman frequently took him out of town, when at home he had time to negotiate with believed underworld characters in order to set up a club in DeSoto County for prostitution and gambling. The club was to pay bribes to Hamilton to operate free from interference by local law enforcement.
 
 
 4
 Robert L. Harbin, Jr. and Robert E. Harbin (father and son) were both engaged in the amusement machine business. Robert L. Harbin, Jr. (Harbin-father) had been engaged in this business for many years. The business did not, however, consume his entire time as he was observed on more than one occasion accepting bribe money from the Camelot Massage Parlor for delivery to Hamilton. Robert E. Harbin (Harbin-son) focused most of his energy on the business, which included representing himself as the "Sheriff's man" and using other strong-arm tactics against potential customers to obtain their business.
 
 
 5
 Ray Bright operated the Bright Bonding Co. which allegedly paid bribes to Hamilton in return for the privilege of operating as a monopoly in DeSoto County.
 
 
 6
 Bill Chaney collected payoffs for Hamilton from the numerous honky-tonk[2] operators throughout the county.
 
 
 7
 Jack Briggs is also an old friend of Hamilton and was an insurance salesman. His insurance work provided him with a cover for his many visits with Fran Jenkins, owner of the Camelot Massage Parlor. He thought his job as an insurance salesman would provide a cover for the visits, but in fact he was picking up payoffs for delivery to Hamilton.
 
 
 8
 Houston Morris was a Louisiana businessman who first came to DeSoto County to set up an alcoholic rehabilitation center and juvenile detention home. That never worked out, but he did get drawn into the amusement machine business and into bribing the Sheriff.
 
 The Scenario
 
 9
 After taking office in early 1976, Hamilton began accepting bribes in return for implied, if not express, promises not to enforce the law against the party paying the bribe. In May, 1976, the FBI office in Jackson, Mississippi, was alerted that something was amiss in DeSoto County. Special agent Wayne Tichenor went to DeSoto County and talked to David Baker, Henry Van Sittert and Fran Jenkins.
 
 
 10
 Baker had operated a lounge in DeSoto County in the spring, but had been closed down by Hamilton after having paid Houston Morris $300 for protection from law enforcement. Van Sittert had operated a bonding company in DeSoto County prior to Hamilton's election. Once Hamilton took office his business declined to the extent that eventually he withdrew from the county. Jenkins was the proprietor of the Camelot Massage Parlor. She was paying Hamilton $300 per week so that he would not enforce the laws against prostitution as they applied to the Camelot.
 
 
 11
 In order to verify Jenkins' story, Tichenor asked her to record the serial number, series and denomination of all payoff bills. He also observed what circumstances suggested were several payoffs. Jenkins continued to record the relevant information from the payoff bills until June, 1977.
 
 
 12
 Meanwhile, the Organized Crime Strike Unit of the Memphis Police Department was planning a "sting" type anti-fencing operation for the area. As part of that operation, Memphis police officers were sent into DeSoto County, primarily to trace interstate movement of stolen goods through the county. While there they discovered that other illegal conduct was occurring.
 
 
 13
 The Memphis Police Department's initial leads led it to believe there was open commerce in narcotics in the area.[3] In order to further investigate those leads, in September, 1976, Sgt. James Kellum went undercover, posing as J. C. Smith, an agent for an out-of-state criminal syndicate. Sgt. Kellum first met with Robert Weatherly,[4] who, believing Kellum was an underworld figure, introduced him to John Harter.
 
 
 14
 Kellum told Harter he wanted to establish an operation in the county involving drugs, prostitution and gambling. Harter indicated Hamilton would be receptive to everything except the drugs, which was in fact how Hamilton reacted. Through negotiations[5] it was agreed that a club, to be called the Pump House, would be set up at the old American Legion Club and would cater to the middle-class whites in the area. The club would offer prostitution and gambling. Money was passed to Hamilton both directly and through Harter. All indications were Hamilton and Harter believed that Kellum and other law enforcement officers who were operating undercover were what they purported to be, underworld crime figures.
 
 
 15
 Negotiations continued to the point of reaching an agreement on how much the club would have to pay the sheriff to operate. Harbin-son installed bingo-type (gambling) pinball machines in the club. All proceeds from the machines were divided 50%-50% between Harbin-son and Les Davis, the manager of the club (an undercover FBI agent). Harbin-son, however, reimbursed Davis for the amount he had paid out to winning players.
 
 
 16
 While Kellum was undercover he learned from Harter that every tonk operator in the county paid Hamilton $50 per week to operate without interference. Investigation verified that allegation and defendant Chaney was identified as the person who made the pickups.
 
 
 17
 More specific evidence, as it relates to individual defendants will be discussed below. Suffice it to say the police uncovered a system of bribes to the sheriff from the tonk operators and those running houses of prostitution so they could operate free from interference and from the bondsman and the amusement machine operators so they could obtain a monopoly position in the county.
 
 The Charges
 
 18
 The federal grand jury for the Northern District of Mississippi returned an eight-count indictment against the defendants. Count 1 alleged a conspiracy to participate in the operation of the DeSoto County Sheriff's Office as a racketeering enterprise in violation of 18 U.S.C. § 1962(d). Indicted in this count were Hamilton, Harter, Harbin-father, Harbin-son, Chaney, Briggs, Bright and Morris. Count 2 alleged a substantive violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) by all defendants. Count 3 charged Hamilton with a violation of 18 U.S.C. § 1952, alleging he travelled between Mississippi and Louisiana to aid a racketeering enterprise. Counts 4 and 5 charged Hamilton and Harter with violations of 18 U.S.C. § 1952, alleging they travelled in interstate commerce on two occasions in aid of the criminal enterprise. Count 6 charged Hamilton, Harter, Morris, Harbin-father and Briggs with extorting and receiving payoffs from massage parlors under color of law in violation of the Hobbs Act. 18 U.S.C. § 1951. Count 7 charged Hamilton, Morris, Harter and Chaney with a Hobbs Act violation, alleging they extorted and received payoffs from honky-tonks under color of law. Count 8 charged Hamilton with obstruction of justice, alleging he tampered with a grand jury witness in violation of 18 U.S.C. § 1503.
 
 
 19
 Defendant Morris pled guilty to one count of interstate travel in aid of racketeering. He was dismissed as a defendant but remained in the indictment as an unindicted co-conspirator in Counts 1, 2, 6 and 7. He testified as a government witness at trial.
 
 
 20
 The remaining defendants pled not guilty and were tried by jury. Hamilton was acquitted on Count 3 but convicted on all other counts. All the other defendants were convicted on all counts.
 
 The Issues on Appeal
 
 21
 Collectively, the defendants raise twenty-two issues on appeal, which can be separated into five major categories: (1) pre-trial rulings; (2) trial rulings; (3) challenges to the jury charge; (4) complaints about the government's closing arguments; and (5) sufficiency of the evidence. While many of the issues lack substantial merit, none are so totally insubstantial to warrant disposition without discussion.
 
 A. Pretrial Rulings
 
 22
 1. Defendants' Motion to Dismiss the Indictment and for a Witness List[6]
 
 
 23
 On appeal it is argued the indictment should have been dismissed because of coercive tactics by the government against grand jury witnesses. This motion was made before trial and was assigned to a United States Magistrate for a hearing. The Magistrate's recommendation that the motion be denied was adopted by the district court.
 
 
 24
 The evidence presented before the Magistrate on this point was conflicting with certain defense witnesses testifying they were threatened by FBI agents with a perjury charge if they did not implicate Hamilton in their Grand Jury testimony, and the FBI agents denying that anyone was threatened or coerced. All witnesses testified that they did not in fact falsely implicate Hamilton or anyone else in their Grand Jury testimony and were not aware of anyone who had. Nonetheless, the defendants contend they were entitled to a dismissal of the indictment or a list of all witnesses who appeared before the Grand Jury so they could prove the Grand Jury considered coerced testimony.
 
 
 25
 We strongly disapprove of the FBI or any law enforcement agency coercing witnesses. There was insufficient evidence in this case, however, to convince the Magistrate who heard the testimony that coercive tactics had been used. We cannot say that finding was clearly erroneous.[7]
 
 
 26
 Though the appellants argue there was sufficient evidence of coercion to entitle them to a witness list, they cite no authority to support such an argument. Providing a defendant with a list of witnesses who testified before the Grand Jury is within the discretion of the district court. See Archer v. United States, 393 F.2d 124 (5th Cir. 1968). Given the absence of a showing that any coerced testimony was considered by the Grand Jury, we cannot say the district court abused its discretion in not ordering a witness list to be provided so the defendants could pursue their claim of coercion.
 
 2. Motion to Suppress[8]
 
 27
 At trial the government introduced into evidence two bills of United States currency which had been seized during a search of Hamilton's house. The bills were relevant because they appeared on the list of payoff money prepared by Jenkins for FBI Agent Tichenor. Hamilton and Harter contend that their motion to suppress that evidence should have been granted because the warrant which authorized the search of Hamilton's house was insufficiently particular as it related to United States currency. Specifically, they argue the warrant should have listed the serial numbers of all currency for which the agents were searching.
 
 
 28
 We find that Harter lacks standing to contest the search of Hamilton's house as the crime with which he was charged is not a possessory offense giving rise to the possibility of automatic standing,[9] Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and he has no legitimate expectation of privacy[10] in Hamilton's house, Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), so as to give rise to ordinary standing.
 
 
 29
 Hamilton, of course, does have standing to contest the validity of the search of his house. He argues that inasmuch as the FBI had Jenkins' list of relevant serial numbers, it should have listed those numbers on the warrant and thus been permitted to seize only currency which appeared on that list. Hamilton argues the failure to do so resulted in a search warrant which violated the particularity requirement of the Fourth Amendment.
 
 
 30
 The Eighth Circuit was faced with similar arguments in United States v. Davis, 542 F.2d 743 (8th Cir.), cert. denied, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976), and Hanger v. United States, 398 F.2d 91 (8th Cir. 1968), cert. denied, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969). In both cases the police were in possession of some but not all of the serial numbers of currency which was subject to seizure. In both cases the court rejected the defendant's argument that the search warrant was insufficiently particular because it did not list the serial numbers it knew were subject to seizure.
 
 
 31
 The result reached in those cases was correct, but should be limited to cases where listing the serial numbers will not further the interests sought to be protected by the particularity requirement. See Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). If the police have only a partial list of relevant serial numbers, listing those numbers in a search warrant as a non-conclusive list of currency subject to seizure gives the party searched no more protection against a general search than is present if the warrant permits simply "seizure of currency." If, however, the police have a conclusive list of serial numbers so that other currency is not relevant to their inquiry and not properly subject to seizure, the listing of those numbers does give the party searched added protection. It is settled law that generic classifications in a warrant are acceptable only when a more precise description is not possible. See James v. United States, 416 F.2d 467, 473 (5th Cir. 1969), cert. denied, 397 U.S. 907, 928, 90 S.Ct. 902, 903, 938, 25 L.Ed.2d 87, 108 (1970). Accordingly, to the extent the police can only legitimately seize currency of known serial numbers, those serial numbers must be listed in the warrant.
 
 
 32
 The question thus becomes whether it would have been consistent with the purpose of this search to have seized currency other than that which appeared on the Jenkins' list. We find that it would have been. Because the police believed Hamilton was accepting kickbacks from many people besides Fran Jenkins, we cannot say their search for currency should have been limited to that which they knew came from her.[11] Therefore, we hold the search warrant in this case was sufficiently particular to satisfy the Fourth Amendment.
 
 3. Motions to Sever[12]
 
 33
 Rule 8(b) of Fed.R.Crim.P. provides: "Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions." Improper joinder under Rule 8 is considered to be inherently prejudicial and thus is reviewable on appeal as a matter of law. United States v. Marionneaux, 514 F.2d 1244 (5th Cir. 1975), 97 S.Ct. 298, 54 L.Ed.2d 189. The parties have not directed us to any fifth circuit cases involving misjoinder in a RICO case. The ninth circuit, however, considered such a challenge in United States v. Campanale, 518 F.2d 352 (9th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). There the court held there is no misjoinder of defendants in an indictment charging racketeering, conspiracy and substantive RICO offenses where all defendants are alleged to have participated in the same underlying pattern of racketeering.
 
 
 34
 It is true that the defendants in this case were alleged to have committed different predicate crimes. Indeed, if this was not a RICO case, the defendants would have a valid argument of misjoinder those defendants alleged to have extorted money from tonk operators hardly engaged in the same "series of acts or transactions" as the defendants who allegedly paid bribes to the sheriff to operate as a monopoly. The gist of the RICO offense, however, is that the defendant, through a pattern of predicate crimes, furthered a racketeering enterprise. The offense charged here is not the commission of the predicate crimes, but the furthering of the enterprise. United States v. Elliott, 571 F.2d 880 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Thus viewed, it is clear the defendants were alleged to have participated in the same offense and joinder was not improper under Rule 8.
 
 
 35
 Nor are the defendants entitled to prevail under Rule 14, Fed.R.Crim.P., which permits severance if a defendant is prejudiced by the joinder. Rulings under Rule 14 are reviewable only for abuse of discretion. United States v. Marionneaux, 514 F.2d 1244 (5th Cir. 1975), cert. denied, 434 U.S. 903, 97 S.Ct. 298, 54 L.Ed.2d 189 (1977). While it is true joint trials have a certain amount of inherent prejudice, see United States v. Elliott, 571 F.2d 880, 905 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), a showing of compelling prejudice is required before a trial court's ruling under Rule 14 will be overturned. See, e. g., United States v. Marable, 574 F.2d 224, 231 (5th Cir. 1978).
 
 
 36
 After a careful review of the record, we are not convinced the trial judge abused his discretion in denying the motion. Although there were seven defendants on trial, the evidence was generally focused on no more than two or three defendants at a time. We cannot say the evidence was so complex or confusing that the jury was unable to make individualized guilt determinations, and merely cumulated the evidence against all the defendants.
 
 4. Motion to Compel Election of Counts[13]
 
 37
 The Harbins argue that they were subjected to double jeopardy because the government was not compelled to elect between Count I (conspiracy to violate RICO) and Count II (aiding and abetting a violation of RICO). Their argument is based primarily on United States v. Austin, 529 F.2d 559 (6th Cir. 1976), which held a conspiracy count and an aiding and abetting count are duplicitous if the same evidence is relied on to prove both offenses, the evidence is offered indiscriminately between the two counts, and all overt acts alleged are relevant to both counts.
 
 
 38
 The Harbins' reliance on Austin is misplaced as this court rejected that test in United States v. Cowart, 595 F.2d 1023 (5th Cir. 1979). The Cowart court indicated the dispositive question is not whether most evidence serves "double duty" but whether each crime requires proof of something the other crime does not.
 
 
 39
 The essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent" between the aider and abettor and the principal. While a community of unlawful intent is similar to an agreement, it is not the same. Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor, United States v. Alvarez, 610 F.2d 1250 (5th Cir. 1980), rehearing en banc granted, March 14, 1980, but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act, United States v. Suarez, 608 F.2d 584, 586 (5th Cir. 1979). "As a matter of law, aiding and abetting the commission of a crime and conspiracy to commit that crime are separate and distinct offenses. . . . Thus, as a general rule, the double jeopardy clause does not prevent prosecution for both conspiracy and aiding and abetting." United States v. Nelson, 599 F.2d 714, 716 (5th Cir. 1979). Accordingly, this assertion of error is without merit.
 
 B. Trial Rulings
 
 40
 1. Was it Error Not to Delete Racial Slurs from the Tape Recordings?[14]
 
 
 41
 Through the use of body recorders and telephone recorders, when possible during the investigation of the sheriff's office, tape recordings were made of conversations between FBI agents and the defendants. Certain of the tapes were played at trial and proved to be the most damaging evidence against Hamilton and Harter, who were the primary participants in the conversations. On several of the tapes, the defendants and the FBI agents were heard using racial slurs and other "offensive language."[15]
 
 
 42
 The defendants' contention is not that the tapes as a whole were inadmissible because of the offensive language, but that the prosecution should have been required to delete the offensive portions. Their argument is that the use of racial slurs may be relevant to show they possess racial animosity but is not relevant to prove that they are guilty of racketeering. They urge that because the language had no probative value on the relevant issue and because it was unfairly prejudicial to the defendants, it should have been excised from the tapes. Fed.R.Evid. 403.
 
 
 43
 We agree that evidence of the racial feelings of the defendants is not probative on the issue of guilt. We disagree, however, over the impact of the racial slurs and other "offensive language" on the tapes. Any prejudicial effect from the language on the tapes was minimized by questions on voir dire which asked prospective jurors whether they could absolutely disregard race as a factor in the trial and whether they would be prejudiced against an individual who used "offensive language." Those prospective jurors who indicated offensive language would influence their judgment or who could not disregard race were excused for cause.
 
 
 44
 Furthermore, the court finds it difficult to believe that even the defendants thought they would be overly prejudiced by the language as no defendant raised any objection to that aspect of the tapes until jury selection began although they had transcripts of the tapes months before trial. Had a motion been made earlier, it is possible the government could have selectively deleted language not necessary to the gist of the conversations. This is not to say, however, that the defendants were entitled to such selective deletion. We are not unaware of the problems caused by such deletions[16] and thus would be extremely reluctant to order them. Furthermore, as to the "offensive language" (not the racial slurs), we are not convinced that given the mores of today's society the presence of such language would prejudice the jury against the defendant. See United States v. DiMuro, 540 F.2d 503 (1st Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977).[17]
 
 
 45
 2. Admission of Certain Hearsay StatementsVarious defendants object to various out-of-court statements which were admitted at trial. To the extent the statements are admissible as statements of a co-conspirator, their admissibility is governed by United States v. Apollo, 476 F.2d 156 (5th Cir. 1973), because the case was tried prior to our decision in United States v. James, 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).
 
 
 46
 Two of the statements[18] objected to are not hearsay as they were admitted for limited purposes only and not to prove the truth of the matter asserted.
 
 
 47
 The third statement objected to[19] was testimony by Debbie Huffman that Robert Weatherly told her that Hamilton was behind him and Morris in their operation of a club. Weatherly further indicated that in order for them openly to engage in illegal conduct they were required to collect payoff money for Hamilton. Initially, it should be noted that most of that information was already in evidence through Morris' testimony. Moreover, any error in admitting the part which was damaging hearsay, namely that Morris and Weatherly were making pickups as consideration for their illegal operations, was adequately cured because Weatherly was the next government witness and thus was available for cross-examination on that point. See United States v. Velasquez, 496 F.2d 1009, 1011 (5th Cir. 1974).
 
 
 48
 3. Testimony Regarding Drug Use at the Camelot[20]
 
 
 49
 During her direct testimony, Huffman stated that Hamilton did nothing to investigate the use of drugs at the Camelot. The defendants assert this evidence was highly prejudicial, of minimal probative value, and not admissible because protection of drug use was not alleged in the indictment. See United States v. Jackson, 588 F.2d 1046, 1055-56 (5th Cir.), cert. denied, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979).
 
 
 50
 Inasmuch as the indictment alleged payoffs were made by the Camelot to buy "freedom from interference by the Sheriff's Department with any prostitution or other activities conducted" there, we cannot say a lack of interference with or investigation of alleged drug use at the Camelot was irrelevant to the indictment. Furthermore, the evidence was relevant to rebut the suggestion raised by Briggs in his opening argument that his presence at the Camelot was at the behest of Hamilton and in furtherance of Hamilton's investigations of drug use there. See United States v. Wellendorf, 574 F.2d 1289 (5th Cir. 1978).
 
 4. Testimony of Sgt. Kellum[21]
 
 51
 The defendants argue incurable prejudice resulted from the following testimony elicited during direct examination of Sgt. Kellum:
 
 
 52
 Q. Did you, during this period, receive any information from Mr. Johnson regarding Robert Weatherly?
 
 
 53
 A. The Memphis office of the FBI had received information that, while we were operating in that area, the sheriff and them didn't know exactly who I was. They said if he was a thug and he had a lot of money, that they were thinking about, according to him, knocking me in the head and taking the money. They didn't know if I was a mob figure or what.
 
 
 54
 Q. What if you were a law enforcement officer?
 
 
 55
 A. They said if they found out I was a law enforcement officer, an undercover officer, that they would try to kill me.
 
 
 56
 Counsel for Hamilton: If the court please, I object to that and move it be stricken from the record and the jury instructed to disregard it.
 
 
 57
 The Court: Yes, I am going to sustain the motion. I am going to sustain the objection and sustain the motion, because it is not clear where the evidence came from.
 
 
 58
 And, ladies and gentlemen of the jury, you will not give any effect to that last statement that this witness had made.
 
 
 59
 This testimony was unadulterated and highly prejudicial hearsay. We are not unaware of the problem of unringing the bell; however, Hamilton cured the error during his cross-examination of Agent Stephens as follows:
 
 
 60
 Q. All right, sir, did you make the statement to those present that if you found that one or more of them were not cooperating that somebody would come up floating in the Tallahatchie River?
 
 
 61
 A. No.
 
 
 62
 Q. Did you or did you not, sir?
 
 
 63
 A. I did not make that exact statement.
 
 
 64
 Q. All right, sir, what statement did you make, please sir?
 
 
 65
 A. Sheriff Hamilton, as he was leaving the room, told me that and I am not quoting his exact words, but this is in essence what he said that he would kill anyone that double-crossed him. And I told him that I understood exactly what he meant. Anybody in my organization that double-crossed me would come up floating in a river. That is generally the conversation I believe you are referring to.
 
 
 66
 Thus, the error occasioned by Kellum's testimony that someone had heard that Hamilton would kill him if his true identity was learned was cured by the defense introducing virtually the same information through Stephens. See United States v. Parker, 469 F.2d 884, 892-93 (10th Cir. 1972).
 
 
 67
 5. Evidence of Defendant Bright's Criminal Record
 
 
 68
 During Bright's cross-examination of George Hitt, Hitt revealed Bright had been indicted for tax evasion. Hamilton and Harter argue this revelation was so prejudicial to them that it entitled them to a mistrial, or at the very least, to a severance. We fail to see how any overpowering prejudice could have resulted to Hamilton or Harter from the revelation that co-defendant Bright had been indicted on tax evasion charges. See, e. g., United States v. Bates, 600 F.2d 505, 509 (5th Cir. 1979) (nothing improper about brief references to criminal conduct of co-conspirators occurring before they joined the conspiracy); United States v. Grant, 510 F.2d 137, 139 (5th Cir. 1975) (references to criminal record of co-conspirator not on trial not prejudical to defendant); United States v. Perez, 489 F.2d 51 (5th Cir. 1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974) (revelation of criminal records of co-defendants is not so prejudical as to warrant a severance); Parker v. United States, 404 F.2d 1193 (9th Cir. 1968), cert. denied, 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969) (severance not warranted though co-defendant took stand and testified to his own prior criminal record).
 
 6. Curtailment of Cross-Examination
 
 69
 Hamilton and Harter assert that the trial court committed error in limiting the cross-examination of Houston Morris and Les Davis. Although the trial judge has considerable discretion over the scope of cross-examination, Fed.R.Evid. 611(b); United States v. James, 510 F.2d 546, 551 (5th Cir.), cert. denied, 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975), the discretionary authority to limit cross-examination is available only after the defendant has been permitted sufficient cross-examination to satisfy the Sixth Amendment. United States v. Summers, 598 F.2d 450, 459-61 (5th Cir. 1979); United States v. Vasilios, 598 F.2d 387, 389-91 (5th Cir.), cert. denied, --- U.S. ----, ----, 100 S.Ct. 277, 456, 62 L.Ed.2d 190, 380 (1979).
 
 
 70
 In both instances complained of there was more than sufficient opportunity for the defendants to examine the government's witness, thus relegating our role to one of determining whether the trial court abused its discretion in limiting the examination.
 
 
 71
 The first instance complained of involved the cross-examination of Houston Morris by counsel for defendant Bright. Counsel was apparently attempting to impeach the credibility of Morris by showing he had lied to FBI agents concerning the facts of a state fraud charge pending against him.
 
 
 72
 Rule 608(b) of the Federal Rules of Evidence provides:
 
 
 73
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . .
 
 
 74
 Thus, whether to permit the inquiry into Morris' bank fraud charges was within the sound discretion of the trial court. We cannot say he abused that discretion.[22] See United States v. Park, 525 F.2d 1279 (5th Cir. 1976).
 
 
 75
 The second instance of curtailed cross-examination complained of occurred while counsel for Harter was cross-examining Les Davis. It was counsel's intention to attack Davis' credibility by showing that he and Agent Gail Denman[23] engaged in a meretricious affair while they were working together. Davis and Denman's relationship had been explored in depth during Hamilton's cross-examination, and had been explored thoroughly by Harter's counsel before the judge directed him to cease repeating his questions. Although a witness may be asked about specific acts of misconduct for purposes of impeachment, the trial judge was fully within his rights in preventing counsel from badgering a witness who answered his questions, albeit with a different response than the one counsel wanted.
 
 
 76
 7. Propriety of the District Court's Instruction on Hearsay[24]
 
 
 77
 Appellants argue the district court erred in charging the jury that it must determine that an individual was a member of the conspiracy before his out-of-court declarations may be considered as substantive evidence. Such a cautionary instruction is clearly correct under United States v. Apollo, 476 F.2d 156 (5th Cir. 1973), which governs this case. Moreover, the giving of a correct instruction over defense objection is neither a denial of the right to counsel nor error. See Lakeside v. Oregon, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978).
 
 
 78
 8. Requirement that Chaney Stand to be Identified
 
 
 79
 Chaney contends the district court erred in forcing him "repeatedly . . . to rise as numerous witnesses who had allegedly paid him weekly payoffs were unable to identify him. . . . Pressure was on the witness in front of the jury to identify SOMEBODY and they could not do it until the Court had somebody stand up, obviously whoever stood up was going to be identified."[25] Chaney directed us to two instances[26] where he was asked to stand, the government located another,[27] and on review of the record we found a fourth.[28]
 
 
 80
 Initially we note that in the two instances Chaney pointed out the witness could not identify Chaney even after he stood up. Accordingly, any error was harmless.
 
 
 81
 Surprisingly, in the two instances not mentioned by Chaney, the witness was able to identify him after he stood up. In the first instance, Herbert White indicated he could not identify Chaney until he stood up because: "(h)e was sitting right behind that man right there (pointing)." In the other instance, Jessie Massey was unable to identify Chaney until he was asked to stand, and there was no explanation why. It is settled law, however, that it is permissible to require the accused to stand for purposes of identification. United States ex rel. Stovall v. Denno, 355 F.2d 731, 736 (2d Cir. 1966) (en banc), aff'd, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Cf. United States v. Roberts, 481 F.2d 892 (5th Cir. 1973) (no error committed when defendant was required to don stocking mask worn during robbery to allow a witness to testify on the similarity of defendant's appearance to that of the perpetrator). Moreover, the fact that for half of the witnesses his standing had no effect and for one witness requiring Chaney to stand merely permitted an unobstructed view supports our decision that the procedure followed here was not prejudicial.
 
 9. Authentication of Briggs-Jenkins Tape
 
 82
 On two occasions during the course of the investigation of the sheriff's office, FBI agents supplied Fran Jenkins with a tape recorder to record the conversations she had with the person who picked up the payoff money. The resulting tapes were admitted as evidence and played for the jury. Defendant Briggs argues the district court committed reversible error by admitting them as they were not properly authenticated.
 
 
 83
 The controlling authority in this circuit on authentication of tapes is United States v. Biggins, 551 F.2d 64 (5th Cir. 1977). There the court held that the party introducing a tape into evidence has the burden of going forward with sufficient evidence to show the recording is an accurate reproduction of the conversation recorded. In a criminal trial this will generally require the government to show: (1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers. 551 F.2d at 66. Briggs argues the government failed to adduce sufficient evidence on the competency of the operator, the absence of material deletions, additions, or alterations, and the identity of the speakers.
 
 
 84
 The tape recorder used by Jenkins was a Dictaphone 220 Travelmaster Recorder, identified as a standard-type small cassette recorder. Wayne Tichenor, an FBI agent, gave her the recorder and instructed her on its use. She left with the recorder and returned with a taped conversation. It is true Jenkins did not take the stand and testify as to her own ability to operate the recorder.[29] However, because of the circumstantial evidence of a recording, Tichenor's testimony relating his instructions and the fact that a cassette recorder is not so complicated to operate that we might question whether one brief lesson on its use is sufficient to render the operator competent, we find there was sufficient evidence that the operator was competent to use the recorder.
 
 
 85
 The second issue, the accuracy of the recording, is the most crucial in deciding whether the recording is authentic. In this case direct evidence of the accuracy of the recording was not possible because one of the alleged parties to the conversation was dead and the other was a defendant. However, the possibility of alterations to the tape need not be eliminated absolutely, but only as a reasonable possibility. See United States v. Haldeman, 559 F.2d 31, 107 (D.C. Cir. 1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).
 
 
 86
 The evidence used to determine accuracy may be direct or circumstantial, United States v. Haldeman, 559 F.2d at 107, and in this case the circumstantial evidence of accuracy was substantial. The first tape was made on January 28. After being given the recorder and being instructed on its use, Jenkins left Tichenor and indicated she was going back to the Camelot. Tichenor went to the Camelot also and set up surveillance. He observed Briggs go in and come out of the Camelot; Briggs was inside for approximately seven or eight minutes. Tichenor met with Jenkins about thirty minutes later. He rewound the tape, "punched the tabs" on the tape,[30] and played it. The audible portion of the tape lasted about seven minutes, thus matching the length of time Briggs was inside the Camelot. Tichenor testified Jenkins displayed no surprise at the contents of the tape.
 
 
 87
 The other tape involved was made on January 29. On this occasion the recorder was given to Jenkins by Lt. John Talley, an officer in the Memphis Police Department's Organized Crime Unit. Talley gave Jenkins the recorder, she was again instructed on its use, and she left. The police then went to the Camelot where Talley observed Briggs enter, and after about fifteen minutes leave the Camelot. Again the tape was retrieved from Jenkins, the tabs punched, and played in her presence. Again she showed no surprise at the contents of the tape.
 
 
 88
 Because the tabs were punched on the tapes as soon as the government gained possession of them, there is no question of subsequent tampering with the tapes. Thus, the only issue is whether there is sufficient evidence to sustain a finding that Jenkins did nothing to destroy the accuracy of the tapes. In United States v. Fuentes, 563 F.2d 527 (2d Cir.), cert. denied, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977), the court was faced with a similar situation. In response to the asserted claim that the party with the recorder could have tampered with the tapes prior to giving them to the authorities, the court stated:
 
 
 89
 Aside from being completely speculative, it is hard to believe that (the party wearing the recorder) could have effectively changed the character of a running conversation, by turning the device on and off, without such attempts being immediately obvious to those present as well as to anyone listening to the tapes. In addition, because the informant would have run a substantial risk of personal harm if he had been observed reaching into his clothing, manipulating the armrest in his car, or creating a "click" during the appellants' incriminating conversations, it is highly unlikely that he would have made such efforts at tampering.
 
 
 90
 563 F.2d at 532. Admittedly in Fuentes the informant who made the recording was observed by federal agents during most, if not all, of the conversations a situation not present here. While the agents in this case could not observe Jenkins while the recording was being made, the circumstantial evidence strongly suggests that the tape could not have been tampered with. The agents met with Jenkins almost immediately after her meeting with Briggs.[31] Accordingly, there was no opportunity for Jenkins to perform any alterations on the tape. Furthermore, as in Fuentes, the tape presented a running conversation, indicating the tape recorder was not turned off and on during the meeting with Briggs.
 
 
 91
 While it is admittedly better to have a tape recording authenticated by a witness who was privy to the conversation as the tape was made, we recognize that is not always possible. When circumstantial evidence is necessary to authenticate the accuracy of the recording, the court must be exacting in its requirements. In this case, there is sufficient evidence to support a finding that there is no reasonable possibility that there were relevant alterations, deletions, or additions to the tapes.
 
 
 92
 Finally, Briggs argues the government did not have adequate evidence from which his voice could be identified. At trial, both Tichenor and David Johnson, another FBI agent, identified the male voice on the tape as that of Briggs. Briggs argues that identification is insufficient because it was based on a conversation with him which occurred approximately eight months after the tape was made.
 
 
 93
 The positiveness of the identification of the voice is more important than when the witness gains the knowledge to make the identification. Tichenor testified he could positively identify the voice as belonging to Briggs because of Briggs' unusual voice. Moreover, in United States v. DiMuro, 540 F.2d 503, 513 (1st Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), the court held a voice identification was proper though the agent first heard the defendant's voice four years after the tape was made. See also United States v. Alfonso, 552 F.2d 605, 616-17 (5th Cir.), cert. denied, 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977). The district court did not err in determining there was sufficient evidence to support a finding that the male voice on the tape belonged to Briggs.
 
 10. Notice to Jury of Jenkins' Death[32]
 
 94
 In response to an implication by the Harbins' counsel during cross-examination that the FBI was responsible for Jenkins' death, on re-direct examination of Tichenor government counsel asked if he knew the cause of Jenkins' death. Hamilton's objection that the medical examiner's report would be the best evidence was sustained. The defense did not accept the government's offer to stipulate that the cause of death was suicide.
 
 
 95
 The Harbins now argue on appeal that the fact that the cause of death went unrevealed permitted the jury to speculate that perhaps the Harbins were responsible. We find their argument less than comvincing. It was the Harbins who first injected the death of Jenkins into the case. Furthermore, if the Harbins were really concerned about the possible adverse impact on the jury, they could have accepted the government's offer to stipulate. In short, the Harbins will not be heard to complain here because their trial strategy did not succeed.
 
 11. Testimony Regarding Witness Tampering
 
 96
 The Harbins object to certain evidence elicited during trial concerning alleged witness tampering. The testimony came from a honky-tonk operator who stated that Ray Richardson, one of Hamilton's deputies, asked him to change his testimony before trial.
 
 
 97
 The government's asserted purpose in introducing the evidence was to show a "consciousness of guilt" on the part of Hamilton. We agree that it was admissible against Hamilton for that purpose, see United States v. Hoffa, 349 F.2d 20, 45 (6th Cir. 1965), aff'd, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), and its prejudicial spillover effect was not so great as to entitle the Harbins to a severance.
 
 C. Jury Charges[33]
 
 98
 The defendants object because the trial court failed to give certain requested charges. It is clear that the trial court does not have to charge the jury with the language suggested by counsel, so long as the charge given, taken as a whole, correctly states the law. United States v. Stokes, 506 F.2d 771, 773 (5th Cir. 1975).
 
 
 99
 The defendant's requested charge was taken from this court's opinion in United States v. Elliott, 571 F.2d 880 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The gist of the requested charge[34] is that the government must prove that each defendant objectively manifested an intent to participate in the criminal enterprise, and that mere association with nefarious characters is not a ground to convict. The charge given[35] clearly conveys that message, without quoting directly from a case. Accord, United States v. Hill, 500 F.2d 733, 737-38 (5th Cir. 1974), cert. denied, 420 U.S. 952, 95 S.Ct. 1336, 43 L.Ed.2d 430 (1975).
 
 
 100
 The second charge complained of[36] was the court's charge[37] on circumstantial evidence. The charge given was approved in United States v. Ransom, 515 F.2d 885, 890 (5th Cir. 1975), cert. denied, 424 U.S. 944, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976). Accordingly, this ground is without merit.
 
 D. Closing Arguments[38]
 
 101
 The defendants contend the government's closing arguments were improper. Summarized, their objections fall into four categories: (1) government counsel improperly vouched for the credibility of certain of their witnesses; (2) government counsel prejudicially personalized their comments; (3) counsel's arguments constituted an unconstitutional comment on the defendants' decision not to testify; (4) counsel's statement that this is an important case was reversible error.[39]
 
 
 102
 1. Did the Government Vouch for the Credibility of its Witnesses ?
 
 
 103
 Certain comments of government counsel are objected to as constituting a vouching for the credibility of their witnesses. During the closing argument counsel stated:
 
 
 104
 Members of the jury, you will recall, I am sure, very vividly, the testimony of Ms. Huffman, if not every detail at least her demeanor and her appearance, and the way she testified. We defy the defense to come up with one reason why you should not believe every word of her testimony. She was a very powerful witness. And we don't believe they can give you any reason why her testimony should not be believed in its entirety.
 
 Shortly thereafter, the prosecutor stated:
 
 105
 Morris received a sentence of three years in a federal penitentiary. A fair conclusion from that is that Mr. Morris would not come up here and be sent off to three years in the penitentiary if he were not telling the truth.
 
 
 106
 The final statements objected to occurred during the government's rebuttal argument. Counsel stated:
 
 
 107
 Now, it has been implied, and insinuated, and charged directly that practically every witness that came in here and took the stand lied to you, committed perjury, another very serious offense in and of itself. It is suggested that some of the witnesses lied because they voted for the other Sheriff. It is suggested that some of the witnesses lied because they were intimidated or coerced by the FBI, or the Grand Jury, or the United States Attorney, or for some other reason. It has been testified that the witnesses came in and lied because they were politically motivated to investigate the Sheriff in DeSoto County. But, ladies and gentlemen, that is just not reasonable, to think that forty-seven people could be found, and assembled, and put together that were involved in the same thing, going on at the same time, and all come up with the same lies, just by coincidence. Somebody would have to orchestrate all of that. Somebody would have to line the witnesses up and hand them out their parts, and do whatever is necessary to convince them to tell these lies under oath and subject to the penalties of perjury for no benefit whatsoever to themselves. What does any one of these witnesses have to gain by lying to you ladies and gentlemen? A lot of
 
 
 108
 Later in the rebuttal argument counsel argued further:
 
 
 109
 Now, let's look at some of those witnesses. You know how they have all been described. Let's go to Mr. Gilder (counsel for Harter below). He had some colorful descriptions for them. He calls them thugs, knaves, scoundrels, reprobates. Well, he doesn't name them, he just lumps them all together. Mr. Williams (counsel for Hamilton below) on the one hand talks about these poor people that had a little honky-tonk, and Mr. Gilder comes along and describes them as witnesses, they were thugs, knaves, scoundrels, and reprobates. Well, just imagine, ladies and gentlemen, the pressure those people are under. You know, they have lived in DeSoto County all their life, or a long time. They have lived there, they were there when Sheriff Hamilton took office. They have to make a living there, when Sheriff Hamilton is Sheriff and while the other Sheriff was there. They have to live there and they are going to be living there when this case is over with. You know, they have got nothing to gain, and everything in the world to lose by coming in here and telling you what they had to put up with for the last two years under Sheriff Hamilton.
 
 
 110
 While it is true a prosecutor may not vouch for the credibility of witnesses based on facts personally known to the prosecutor but not introduced at trial, United States v. Davis, 487 F.2d 112, 124-25 (5th Cir. 1973), cert. denied, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878 (1974), that does not mean the prosecutor cannot argue that the fair inference from the facts presented is that a witness has no reason to lie. See United States v. Morris, 568 F.2d 396 (5th Cir. 1978). Both instances complained of in the government's initial closing arguments fall into the latter rather than the former category.
 
 
 111
 The statements objected to during the government's rebuttal also were not improper. During the defendants' closing arguments, many statements were made which questioned the veracity of the government witnesses, and which referred to them en masse as "thieves, rogues, whores and disgruntled politicians." The prosecutor is not obliged to sit quietly while character assaults are made on his witnesses; he is entitled to argue fairly their credibility. See United States v. Normile, 587 F.2d 784, 787-88 (5th Cir. 1979). The rebuttal arguments complained of were fair rebuttal to the defense assaults.
 
 
 112
 2. Did the Government Prejudicially Personalize their Comments ?
 
 
 113
 During his closing argument, the United States Attorney stated:
 
 
 114
 That all adds up to the thing which reminds me of which I was quite young, growing up in Alcorn County. The court, I believe on voir dire, told you that I was from Corinth, in that area. I used to play down in the old mill pond near Hinkle Creek.
 
 
 115
 (Defense counsel's objection overruled.)
 
 
 116
 I might say, the only reason I mention this is, I think everyone except Mr. Burglass, probably not everyone, but at least three lawyers portrayed themselves as country lawyers, I believe. I don't have anything but a crossroads that I came from. But that hasn't anything to do with the case.
 
 
 117
 But I am just suggesting that to tell you that counsel have been up here talking about a lot of things that have no bearing whatsoever and that the purpose of that is to get your mind off of the evidence.
 
 
 118
 Allegedly improper prosecutorial comments must be considered in context when deciding on their propriety. United States v. Bursten, 453 F.2d 605, 608 (5th Cir. 1971), cert. denied, 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972). In context, given numerous references by defense counsel to their humble beginnings and because the import of the statement was to remind the jury that the backgrounds of counsel are not relevant and that the case is to be decided on the relevant facts, we cannot say the prosecutor's comments were improper.
 
 
 119
 3. Did the Government Comment on the Defendants' Failure to Testify ?
 
 
 120
 In the most colorable of their claims concerning the government's closing arguments, the defendants argue government counsel commented on the fact the defendants chose not to testify.[40] It is settled law that the government may not comment on a defendant's failure to testify, Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961), either directly or indirectly, United States v. Harbin, 601 F.2d 773 (5th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979); United States v. Chandler, 586 F.2d 593 (5th Cir. 1978), cert. denied, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979); Benham v. United States, 215 F.2d 472 (5th Cir. 1954). The test for what constitutes such a comment was stated in United States v. Rochan, 563 F.2d 1246 (5th Cir. 1977):
 
 
 121
 To reverse for improper comment by the prosecutor, we must find one of two things: that "the prosecutor's manifest intention was to comment upon the accused's failure to testify" or that the remark was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify".
 
 
 122
 563 F.2d at 1249 (citations omitted).
 
 
 123
 The rule as stated in Rochan is not, however, to be construed to prohibit a comment on the failure of the defense, as opposed to the defendant, to counter or explain the evidence. United States v. Dearden, 546 F.2d 622, 625 (5th Cir.), cert. denied, 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977); United States v. Hill, 508 F.2d 345 (5th Cir.), cert. denied, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 672 (1975). Accordingly, it is not error to comment on the failure of the defense to produce evidence on a phase of the defense upon which the defendant seeks to rely. Smith v. United States, 234 F.2d 385 (5th Cir. 1956). See also United States v. Goodwin, 470 F.2d 893, 900 (5th Cir. 1972), cert. denied, 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973).
 
 
 124
 The comments complained of here must be viewed inrelation to the context of the trial which preceded them. During opening statements and during cross-examination, the defendants, especially Hamilton, attempted to develop an alternative explanation for their conduct namely, that Hamilton was investigating Stephens and Kellum. Given that purported defense, the comments objected to,[41] for the most part, argue to the jury only that there is simply no evidence to back up the defense.
 
 
 125
 There are two comments which were objected to which do not clearly fall into the above category. At one point the Assistant United States Attorney stated: "Members of the jury, the defense made you a number of promises in their opening statements as to what would happen in this case. They said that they would show you that Ed Osborne caused all of this." An objection was sustained and the court immediately gave a cautionary instruction to the jury. We cannot say the comment was such that the jury would naturally and necessarily construe it to be a comment on the failure of the defendants to testify, cf. United States v. Bates, 512 F.2d 56, 58 (5th Cir. 1975) (prosecutor's remark during rebuttal, "you didn't hear from the culprit," is of such a character that the jury would naturally and necessarily understand it to be a comment on the defendant's failure to testify), and there is no indication it was the government's manifest intention to so comment. See United States v. Chandler, 586 F.2d 593, 603-04 (5th Cir. 1978), cert. denied, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979).
 
 
 126
 The final comment objected to is as follows: "We submit that the overwhelming evidence in this case, and the almost uncontradicted evidence in the case, certainly warrants ." That statement is not one which the jury would necessarily construe as referring to the defendants' failure to testify, compare United States v. Toler, 440 F.2d 1242 (5th Cir. 1971) with Davis v. United States, 357 F.2d 438 (5th Cir. 1966), nor is there any indication the prosecutor manifestly intended for the statement to comment on the defendants' failure to testify. In fact, when, after objection, counsel completed his paragraph, his manifest intent appeared to be to remind the jury to consider the evidence and not the questions or comments of counsel.[42]
 
 
 127
 4. Did Counsel's Statement that this is an Important Case Constitute Reversible Error ?
 
 
 128
 At the very outset of his summation, the Assistant United States Attorney referred to this "as one of the most important cases ever tried in this district." Upon objection, the trial judge immediately instructed the jury that all cases are important this one no more so than the next. The instruction was sufficient to minimize any prejudice from the improper comment. See, e. g., United States v. Caruso, 358 F.2d 184 (2d Cir.), cert. denied, 385 U.S. 862, 87 S.Ct. 116, 17 L.Ed.2d 88 (1966).
 
 E. Sufficiency of the Evidence
 
 129
 Defendants Bright, Briggs, Chaney, Harbin-father and Harbin-son argue there was insufficient evidence to sustain their convictions.
 
 1. Substantive RICO Violation
 Section 1962(c) of Title 18 provides:
 
 130
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 131
 Thus, to prove a RICO violation, the government must prove (1) the existence of an enterprise; (2) that the defendant is "associated with" the enterprise; (3) that the defendant participated in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity.[43]
 
 In this case the indictment alleged that:
 
 132
 (T)he DeSoto County Sheriff's Office was the law enforcement agency in DeSoto County empowered to enforce the laws of the State of Mississippi and of DeSoto County, and constituted an enterprise, as defined in 18 U.S.C. § 1961, which was engaged in and whose activities affected interstate commerce.
 
 
 133
 From on or about January 1976 to on or about the date of this indictment, in the Northern District of Mississippi, HARVEY HAMILTON, JOHN HARTER, HOUSTON MORRIS, ROBERT L. HARBIN, JR., ROBERT E. HARBIN, LORIN RAY BRIGHT, JOHN THOMAS "BILL" CHANEY and C. E. "JACK" BRIGGS, defendants herein, aided and abetted by each other and by Macon Campbell and Robert Weatherly, not named as defendants in this indictment, being associated with an enterprise engaged in and whose activities affect interstate commerce, as defined in Section 1961 of Title 18 of the United States Code, that is the DeSoto County Sheriff's office, did conduct and participate in, directly and indirectly, the conduct of such enterprise's affairs through a pattern of racketeering activity, as defined in Section 1961 of Title 18 of the United States Code, while Harvey Hamilton was Sheriff of DeSoto County and a public officer of the State of Mississippi. . . .
 
 
 134
 There is no contention that the Sheriff's office was not nor could not be an enterprise. See United States v. Brown, 555 F.2d 407 (5th Cir. 1977), cert. denied, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).[44]
 
 
 135
 Thus, the essential question in reviewing the sufficiency of the evidence on the substantive RICO count is whether there was sufficient proof that each defendant was associated with the Sheriff's office and participated in the conduct of the Sheriff's office affairs through a pattern of racketeering activity.[45]
 
 
 136
 a. Ray Bright
 
 
 137
 Defendant Bright ran the Bright Bonding Co. which was the only bonding company in DeSoto County during most of the time in question. The indictment alleged that he "did promise, offer and give to Harvey Hamilton money and other property with intent to influence Hamilton to accept bail bonds only from the company owned by Bright, in violation of § 97-11-11 of The Mississippi Code."
 
 
 138
 Bright argues there was insufficient evidence that he bribed Hamilton. We disagree. A former employee of Bright, George Hitt, testified that Bright told him that he was making payoffs to Hamilton. Indeed, according to Hitt's recollection of the conversation, Bright indicated that he was having difficulty paying his income taxes because the bribes were so large. Bright contends this evidence is not credible because Hitt was a disgruntled former employee. This court does not make credibility determinations; that function is reserved for the trial jury. United States v. Grimm, 568 F.2d 1136, 1138 (5th Cir. 1978); Walker v. United States, 301 F.2d 94 (5th Cir. 1962). The evidence was fully admissible against Bright as an admission and can be considered as direct evidence that he bribed Hamilton. Fed.R.Evid. 801.
 
 
 139
 There was also circumstantial evidence to corroborate Bright's admission that he was paying kickbacks to the Sheriff. During the search of Hamilton's house, records of the bonding company were found. Unlike similar records found at the bonding company, these records showed the sum of the premiums collected divided by three. This is corroboration of Hitt's testimony that Bright was paying one-third[46] of his premiums to Hamilton.
 
 
 140
 Viewing the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there was sufficient evidence from which the jury could conclude that Bright committed at least two acts of bribery. Thus, the requirement that the defendant engaged in a "pattern of racketeering activity" was met.[47]
 
 
 141
 Moreover, there can be no serious contention that Bright was not "associated with" the enterprise. In a case which presents the converse of these facts, the Third Circuit reversed the holding of a lower court that a magistrate who accepts bribes from a bonding company is not "associated with" the bonding company-enterprise. United States v. Forsythe, 560 F.2d 1127 (3rd Cir. 1977). The Forsythe holding that "association with" includes insiders and outsiders was adopted by this court in United States v. Elliott, 571 F.2d 880, 903 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Thus, the fact that Bright may not have been as involved in the workings of the Sheriff's office as some of his co-defendants does not negate the fact that the evidence revealed a continual relationship of bribery between Bright and Hamilton.
 
 
 142
 The final element of a RICO violation is proof that the defendant participated in the affairs of the enterprise through a pattern of racketeering activity. Bright's sole participation in the enterprise took the form of bribery of Hamilton. Accordingly, this case is distinguishable from those where the pattern of racketeering activity was not linked to the alleged enterprise's affairs. See United States v. Mandel, 591 F.2d 1347, 1376 (4th Cir. 1979); United States v. Nerone, 563 F.2d 836, 850-52 (7th Cir. 1977), cert. denied, 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978). There was sufficient evidence from which a jury could find Bright participated in the affairs of the Sheriff's office by bribing the Sheriff.
 
 
 143
 b. C. E. "Jack" Briggs
 
 
 144
 Count II of the indictment as it pertained directly to Briggs alleged that "from on or about March 1976 to on or about June 1977 Harvey Hamilton, aided and abetted by Houston Morris, John Harter, Robert L. Harbin, Jr. and C. E. " Jack" Briggs, did accept promises, offers and gifts of money and other property not to enforce Mississippi laws pertaining to prostitution, in violation of § 97-11-13 of The Mississippi Code."
 
 
 145
 Briggs argues that there was absolutely no admissible evidence against him to support such a proposition. When the case against a defendant relies principally on circumstantial evidence, the test is whether the jury might reasonably have concluded that the evidence fails to exclude every reasonable hypothesis but that of guilt. United States v. Elliott, 571 F.2d at 906; Roberts v. United States, 416 F.2d 1216, 1220 (5th Cir. 1969). Initially, we would note that even without the contested tape recorded conversations,[48] there is sufficient circumstantial evidence that Briggs acted as a bagman for payoffs from the Camelot to conclude that he committed at least two predicate crimes.
 
 
 146
 The circumstantial evidence suggesting Briggs was collecting bribes from the Camelot massage parlor is as follows: (1) Debbie Huffman testified that Fran Jenkins met with Briggs at the Camelot shortly after Jenkins had recorded the serial numbers of the $300 in payoff money, that she left the room and did not see a transfer of money, but after Briggs left the money was gone; (2) A police officer with the Memphis Police Department observed Briggs go to the Camelot where he remained for seven to ten minutes, leave and immediately meet with Hamilton in a parking lot away from the Camelot; (3) John Talley with the Memphis Police Department also observed Briggs go to the Camelot, stay a short while, and leave. Briggs was then observed by an FBI agent going immediately to a parking lot to rendezvous with Hamilton. In light of the overwhelming other evidence that the Camelot was making payoffs to Hamilton in order to engage in prostitution free from official interference, there is sufficient evidence from which the jury could rule out every reasonable hypothesis except that Briggs was acting as a bagman for Hamilton.
 
 
 147
 Moreover, the tape recorded conversations between Briggs and Jenkins support this conclusion. The tapes revealed that Briggs was aware of the bribery between Jenkins and Hamilton, that he agreed to ask Hamilton to reduce the payoff amounts until business picked up and that he supplied Jenkins with a cover story in the event the federal agents asked her why she was giving money to him.
 
 
 148
 The evidence related above is sufficient to support a jury conclusion that Briggs was "associated with" the enterprise. Furthermore, acting as a bagman for pickups from a house of prostitution and negotiating the amount of bribes shows conclusively that Briggs' participation in the enterprise was through a pattern of racketeering.
 
 
 149
 c. John Thomas "Bill" Chaney
 
 
 150
 As relevant to Chaney the indictment alleges that
 
 
 151
 From on or about March 1976 to on or about June 1977 Harvey Hamilton, aided and abetted by Houston Morris, John Harter, Robert L. Harbin, Jr. and C. E. "Jack" Briggs, did accept promises, offers and gifts of money and other property not to enforce Mississippi laws pertaining to prostitution, in violation of § 97-11-13 of The Mississippi Code.
 
 
 152
 Count II also incorporated by reference Count VII of the indictment which alleged that
 
 
 153
 From on or about January 1976 to on or about June 1977, in the Northern District of Mississippi, HARVEY HAMILTON, aided and abetted by HOUSTON MORRIS, JOHN HARTER and JOHN THOMAS "BILL" CHANEY, did affect and attempt to affect commerce and the movement of articles in commerce by extortion, that is by knowingly and willfully obtaining the property of other persons with their consent induced by fear and under color of official right by causing owners and operators of honky-tonks in DeSoto County to make weekly payoffs to HARVEY HAMILTON, Sheriff to DeSoto County, in return for freedom from interference by the Sheriff's Office with gambling, sale of alcoholic beverages and other activities carried on at the honky-tonks; in violation of Sections 2 and 1951 of Title 18 of the United States Code.
 
 
 154
 The proof at trial was overwhelming that Chaney was being paid by Hamilton to collect payoff money from rural honky-tonk operators. Chaney was identified in court by Jessie Massey, Herbert C. White, and Helton Saulsberry as the man who collected the payoff money from them. Furthermore, Henry "B.B." Tong testified Chaney told him he would have to pay the Sheriff in order to operate free from interference. Because Mr. Tong did not permit gambling in his establishment he never made any payoffs to Chaney. Chaney admitted to Jim Taylor, a sheriff's deputy, and J. L. Tinkle, a Justice Court Judge, that he was making pickups from the honky-tonks for Hamilton. The Sheriff's dispatcher and Jim Taylor testified Chaney was frequently present in the Sheriff's office. Accordingly, there was more than sufficient evidence that Chaney committed at least two predicate crimes, that he was associated with the enterprise, and that he participated in the enterprise through his predicate crimes.
 
 
 155
 d. Robert L. Harbin, Jr. (Harbin-father)
 
 
 156
 Count II of the indictment, as it pertains to Harbin-father alleges that
 
 
 157
 From on or about April 1976 to on or about June 1977 Robert L. Harbin, Jr. and Robert E. Harbin did promise, offer and give to Harvey Hamilton money and other property with intent to influence Hamilton not to interfere with their operation of amusement and gambling machines in DeSoto County, in violation of § 97-11-11 of The Mississippi Code.
 
 
 158
 Count II incorporated by reference Count VI which alleges that
 
 
 159
 From on or about March 1976 to on or about June 1977, in the Northern District of Mississippi, HARVEY HAMILTON, aided and abetted by JOHN HARTER, HOUSTON MORRIS, ROBERT L. HARBIN, JR. and C. E. "JACK" BRIGGS, did affect and attempt to affect commerce and the movement of articles in commerce by extortion, that is defendants did knowingly and willfully obtain the property of other persons with their consent induced by fear and under color of official right by causing personnel of the Camelot massage parlor to make weekly $300 payoffs to HARVEY HAMILTON, Sheriff of DeSoto County, in return for freedom from interference by the Sheriff's Office with prostitution and other activities carried on at The Camelot Massage Parlor; in violation of Sections 2 and 1951 of Title 18 of the United States Code.
 
 
 160
 Harbin-father argues that the government failed to prove he, alone or in combination with his son, obtained exclusive control of the amusement machine business, that he and his son were unfairly tried as a unit and that the evidence against him was not credible.
 
 
 161
 It is not relevant to Count II whether or not Harbin-father obtained exclusive control of the amusement machine business as that is not alleged in this count.[49] Harbin-father is correct in arguing that some of the testimony at trial referred only to Bob or Bobby Harbin, without specifying which Harbin was meant. Such testimony cannot, of course, be considered when determining whether there is sufficient evidence to sustain the convictions.
 
 
 162
 There is sufficient other evidence from which the jury could conclude Harbin-father committed acts of extortion against the personnel of the Camelot and paid Hamilton bribes in connection with his amusement machine business. The evidence of extortion is as follows: Houston Morris testified Harbin-father agreed to collect payoffs from Fran Jenkins for Hamilton; Harbin-father told Macon Campbell that he had made a pickup from Jenkins at the Camelot but that Jenkins had made the payoff in a conspicuous manner which scared him; Joe Lattus, an FBI agent, observed Harbin-father accept a roll of money from Fran Jenkins on May 21, 1976; and Wayne Tichenor, an FBI agent, observed Harbin-father accept something from Jenkins, and later that day Jenkins gave him a list of serial numbers from payoff money. In combination we find there is sufficient evidence to support a finding that Harbin-father committed extortion.
 
 
 163
 There is also sufficient evidence that Harbin-father was paying bribes to Hamilton. Though Harbin-father argues there is "absolutely no evidence as to bribery " by him, we find there was such evidence from Robert Weatherly. The Harbins characterize Weatherly as a "con man, bunko artist, and convicted felon, and an unindicted alleged co-conspirator" in an effort to discredit his testimony. We cannot, however, make credibility choices. United States v. Grimm, 568 F.2d 1136, 1138 (5th Cir. 1978). Weatherly testified that on more than one occasion the Harbins, together, brought payoff money to the 301 Club for Hamilton and that Houston Morris told him the payoffs were for the gambling-type pinball machines Harbin had in the county.[50] Though that is not overwhelming evidence, in light of the fact that there appeared to be unrestricted use of illegal gambling-type pinball machines owned by one or both Harbins, and quite a bit of nonspecific evidence that to operate gambling-type machines the Sheriff must be paid off, we find there is sufficient evidence of bribery.
 
 
 164
 Having found sufficient evidence of commission of at least two predicate crimes,[51] the question becomes whether Harbin-father was associated with the enterprise and whether he participated in the affairs of the enterprise through a pattern of racketeering activity. Collecting payoffs for the enterprise and paying money so the enterprise will ignore illegality is clearly an association with it. Furthermore, his participation in the enterprise was linked to his acts of extortion and bribery.
 
 
 165
 e. Robert E. Harbin (Harbin-son)
 
 Count II of the indictment alleges that
 
 166
 From on or about April 1976 to on or about June 1977 Robert L. Harbin, Jr. and Robert E. Harbin did promise, offer and give to Harvey Hamilton money and other property with intent to influence Hamilton not to interfere with their operation of amusement and gambling machines in DeSoto County, in violation of § 97-11-11 of The Mississippi Code.
 
 
 167
 The most damning evidence against Harbin-son is that he told Olivia Sutton, a barkeeper, that she had to use his juke box because she was in his district, and that he could do favors for her because he "was in with the Sheriff." Further connection between Harbin-son's amusement machine business and the enterprise is found in evidence that Harbin-son told Les Daniels that if any machines were to go into the Pump House they were to be his and asked Daniels if he had checked with Hamilton about the location. Furthermore, after installing machines at the Pump House, Harbin-son told Daniels that he, Harbin-son, had talked to Hamilton about the payoffs. This, in connection with the testimony of Weatherly discussed in connection with Harbin-father, is sufficient for a jury to decide Harbin-son committed at least two acts of bribery in return for protection of the gambling machines.
 
 
 168
 There was clear evidence that Harbin-son associated with the enterprise by negotiating the amount of payoffs and his participation was through his payment of bribes.
 
 2. RICO Conspiracy Count
 
 169
 The RICO conspiracy statute provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To be convicted of conspiracy to violate RICO there must be proof that the individual, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of the enterprise, through the commission of two or more predicate crimes. United States v. Elliott, 571 F.2d at 903. In this case, as the evidence recited above indicates, there was ample evidence that Hamilton, Harter, Chaney, Briggs and the Harbins were members of the Sheriff's office enterprise, and all participated in that enterprise through the commission of at least two predicate crimes. As in Elliott, "Where the evidence establishes that each defendant, over a period of (time), committed several acts of racketeering in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable." 571 F.2d at 903.
 
 
 170
 The indictment alleges that Ray Bright was also a member of that conspiracy. After a careful review of the record, we find Bright was not a member of a conspiracy comprised of Hamilton, Harter, Morris, Harbin-father, Harbin-son, Bright, Chaney, Briggs, Weatherly, Campbell and others unknown to the Grand Jury, as the indictment alleged. However, there was more than sufficient evidence, as related above, that Bright was a member of a more limited conspiracy comprised of himself and Hamilton[52] which had as its goal a violation of RICO. This situation is so similar to that in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), that we are compelled to hold that the variance between the indictment and the proof did not affect Bright's "substantial rights," and hence is not fatal variance. See, e. g. United States v. Wayman, 510 F.2d 1020 (5th Cir.), cert. denied, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975); United States v. Cruz, 478 F.2d 408 (5th Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973).
 
 3. Miscellaneous Counts
 
 171
 In Count VI of the indictment Hamilton, Harter, Houston Morris, Harbin-father and Briggs were charged with extorting and receiving payoffs from massage parlors under color of state law in violation of 18 U.S.C. § 1951 (the Hobbs Act).[53] Harbin-father and Briggs challenge the sufficiency of the evidence supporting their convictions.
 
 
 172
 Harbin-father argues that he was the victim of extortion, but does not address the issue of his participation in the extortion of money from Jenkins except to say that the conviction was based only on hearsay. As discussed above, however, we have found that the hearsay in question was admissible. As discussed in the context of the RICO count, there is sufficient evidence to support a finding that Harbin-father committed extortion.
 
 
 173
 Briggs states in a very conclusory manner that there is no evidence to support his conviction on Count VI. As was discussed above, even without the evidence from the contested tapes there is more than sufficient evidence that Briggs was extorting money from the Camelot.
 
 
 174
 Count VII charged Hamilton, Harter, Houston Morris, and Chaney with extorting and receiving payoffs from honky-tonks under color of state law in violation of the Hobbs Act. It is unclear from Chaney's brief whether he contends there is insufficient evidence to sustain this conviction. In an effort to deal with all possibilities, however, this court has reviewed the evidence and finds there is sufficient evidence to support the conviction of Chaney on Count VII.
 
 Conclusion
 
 175
 The convictions of all defendants on all counts are AFFIRMED.
 
 
 
 [1]
 Several persons who committed crimes in conjunction with or under the protection of Hamilton testified on behalf of the government and thus were never indicted. For example, Macon Campbell, Constable of Southaven, received payoffs from massage parlors as consideration for not enforcing the law. James Jenkins, another constable, also received payoffs so he would not enforce the law as it applied to people in his district
 
 
 [2]
 Honky-tonks or just "tonks" as they existed in DeSoto County are small establishments where gambling, illegal sales of alcohol and sometimes prostitution could be found. They were often located in little shacks near the proprietors' homes in the country
 
 
 [3]
 The lead as to narcotics did not prove to be correct. In fact, Harter was very proud of the fact that Hamilton had his scruples prostitution, bribery, and gambling were one thing, but narcotics trafficking was quite another
 
 
 [4]
 Weatherly was part owner, with Harter, Houston Morris and Joe Grice, of the 301 Club. The Club had gambling and was making payoffs to Hamilton. Weatherly was an unindicted co-conspirator in several counts of the indictment
 
 
 [5]
 For the most part the conversations between the undercover police officers and the defendants were taped either by recording devices attached to telephones or by body recorders. These tapes were introduced into evidence and provided the most damaging evidence against Hamilton and Harter
 
 
 [6]
 This issue is raised by Hamilton, Harter and Chaney
 
 
 [7]
 This is not to suggest that a finding that some witnesses testified falsely because of coercion by government agents would entitle a defendant to a dismissal of the indictment. Because there was not even a colorable showing of false, coerced testimony before the Grand Jury in this case, we do not reach that point
 
 
 [8]
 This issue is raised by Hamilton and Harter
 
 
 [9]
 Shortly before this opinion was announced, the Supreme Court overruled Jones v. United States, thus abandoning the possibility of automatic slanting. United States v. Salvicci, 444 U.S. 990, 100 S.Ct. 519, 62 L.Ed.2d 418 (1980)
 
 
 [10]
 For a detailed discussion of the concept of "expectation of privacy," see United States v. Vicknair, 610 F.2d 372, 379-81 (5th Cir. 1980)
 
 
 [11]
 For example, currency which had the fingerprints of a tonk operator, Bill Chaney and Hamilton on it would have been extremely relevant to the FBI's case, but would not have appeared on Jenkins' list of payoff bills
 
 
 [12]
 This issue is raised by the Harbins, Bright and Chaney
 
 
 [13]
 Although we deal with this issue on the merits, we also note that Count II of the indictment actually charged the defendants both as principals and as accessories. Because we find the evidence sufficient to sustain their convictions as principals, we never actually deal with accessory complicity. See note 43, infra
 
 
 [14]
 This issue is raised by Chaney, Hamilton and Harter
 
 
 [15]
 The "offensive language" consisted largely of expletives
 
 
 [16]
 The primary problem with selectively deleting portions of a tape of a running conversation is that it breaks the flow of the conversation thus decreasing the usefulness of the evidence. Also, selective deletion permits the jury to speculate erroneously as to what was said in the deleted portion
 
 
 [17]
 Chaney's argument that the use of the word "nigger" and similar racial slurs on the tapes improperly injected race into the trial is particularly unpersuasive. Indeed, after a complete reading of the trial transcript, we find the only party who purposefully injected race into the proceedings was Chaney's counsel. While all attorneys had been calling all witnesses by their surnames, counsel for Chaney deliberately called Mr. Jessie Massey, a black government witness, by his first name while conducting cross-examination. Counsel for the government objected, but the objection was overruled. (T. 1165-66)
 When all witnesses are referred to as "Mister" except one who is called by his given name, the logical presumption is that this witness is somehow less deserving of respect, and hence less credible than other witnesses. This court does not approve of such outdated, racist practices.
 
 
 [18]
 One statement objected to was Macon Campbell's (an unindicted co-conspirator) testimony that Danny Owens (a part owner of a massage parlor) told him that he was paying $300 per week for protection. This was admitted for the limited purpose of showing why Campbell approached Hamilton to discuss the payoffs, i. e. to explain subsequent conduct, and not to prove the truth of the matter asserted. Accordingly, the statement is not hearsay. Fed.R.Evid. 801
 The second statement complained of which is not hearsay because it was not introduced to prove the truth of the matter asserted was introduced through the testimony of Houston Morris. He testified concerning the negotiations between him and Fran Jenkins over the amount of the payoff to be paid by the Camelot. These statements were introduced only to provide a basis for Morris' subsequent conduct and to give meaning to statements made by Hamilton to Morris, but not for the truth of the matter asserted.
 
 
 [19]
 Hamilton and Harter raise the objection to the introduction of this testimony on appeal
 
 
 [20]
 This issue is raised by Hamilton, Harter and the Harbins
 
 
 [21]
 This issue is raised by Hamilton, Harter, and the Harbins
 
 
 [22]
 The relevant portion of the cross-examination occurred as follows:
 Q All right. Now, Mr. Morris, you have tried to be truthful about everything that you have said, haven't you?
 A I have tried my best, ever since I've been involved in everything up here in Oxford, yes, sir.
 Q Well, you were truthful to the Federal Bureau of Investigation when you told them and if you want to, see if I am reading correctly. I am reading from the report of the FBI dated 10-6-77, sir, and on the last page.
 A (Statement examined)
 Q Do you have it, Mr. Morris?
 A Yes, sir.
 Q All right, Mr. Morris, am I reading correctly when I say that you told the FBI that you were being sought by the local authorities in Jackson, Mississippi, on a charge of conspiracy to commit fraud, which was related to his obtaining a loan from Bankers Trust Savings and Loan in the amount of either $600,000 or $700,000? Did you tell them that?
 A I probably did, sir.
 Q Now, Mr. Morris, I don't want to know whether you probably did. I am asking you, did you tell them, "Yes" or "No"?
 A About the charge in Mississippi
 Q I am talking about
 A yes, sir.
 Q I am talking about the amount of $600,000 or $700,000.
 A Yes, sir.
 Q All right, did you tell the truth?
 A On the charge?
 Q No, sir, did you tell the truth about the amount of the loan?
 A There has been so many statements made about the amount of money on the Mississippi case until I would have to go back to all the documents and all the stuff that has been made about it.
 Q All right, sir. Would you have missed it by one million, two hundred thousand dollars?
 A Well, you are getting into something or other that actually you are talking about the amount of money that was pledged to a project. You are not talking about the amount of money that was drawn from that pledge.
 The entire amount of the mortgage that was placed on the property was a million eight, or so. But all that money never was drawn. So, like I say, if you are going to get into another case, or another indictment that is over me, we are going to have to go to some other kind of procedure or something.
 Q Mr. Morris
 A Because I don't remember all of those figures.
 Q I simply asked you a simple question, whether or not you told the FBI that you had received a loan from the Banker's Trust Savings and Loan Association in the amount of either $600,000 or $700,000, and your answer was "Yes". I then asked you if it was not a matter of fact that the amount of the loan was, I said in excess of 120,000 more than this, and the exact figure being $1,851,700. Isn't that true?
 A I borrowed a lot of money from Banker's Trust. I imagine it was about $8,000,000. So, like I say, if you are going to get into all that kind of stuff
 THE COURT:
 I don't think the details of the other case, Mr. Farese, is important in this case.
 I am going to ask you not to go into it. We can't try the other case. There has been no trial of it. There has been no conviction on it.
 So, I think you are going into features of that case, to the depth of which you are going, I think it is improper in this proceedings. So, I am going to ask you not to go into the
 MR. FARESE:
 Yes, sir.
 THE COURT:
 trial of the other case.
 MR. FARESE:
 Your Honor
 THE COURT:
 Except so far as you have gone.
 MR. FARESE:
 Without going into chambers, on credibility may I go into it, on that feature?
 THE COURT:
 No, sir, you may not.
 
 
 [23]
 Gail Denman is an FBI agent who joined the investigation by posing as Les Davis' wife. This was in an effort to protect Davis from being approached by prostitutes as well as to provide additional security
 
 
 [24]
 This issue is raised by Hamilton, Harter and the Harbins
 
 
 [25]
 Brief for Chaney, p. 11
 
 
 [26]
 Chaney was asked to stand during the testimony of Odis White (T. 1362) and C. D. Morgan (T. 1469)
 
 
 [27]
 During the testimony of Herbert White, Chaney was asked to stand (T. 1397-98)
 
 
 [28]
 Chaney was also asked to stand during the testimony of Jessie W. Massey, Sr. (T. 1161)
 
 
 [29]
 Fran Jenkins died before this case went to trial
 
 
 [30]
 "Punching the tabs" on the tape insures there can be no accidental erasures or recording over the taped conversations
 
 
 [31]
 On both days, as soon as Briggs left the Camelot the law enforcement officers drove to a prearranged location in Memphis where they met Jenkins, who also had left as soon as Briggs departed
 
 
 [32]
 The Harbins raise this issue
 
 
 [33]
 This issue is raised by Bright and the Harbins
 
 
 [34]
 The defendants requested that the trial court charge the jury:
 The Act (RICO) does not authorize that individuals be tried en masse for the conglomeration of distinct and separate offenses committed by others. Nor does it punish mere association with conspirators or knowledge of illegal activity; its proscriptions are directed against conduct, not status. To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes. One whose agreement with the members of an enterprise did not include this vital element cannot be convicted under the Act.
 This language is taken from this court's decision in Elliott, 571 F.2d at 903.
 
 
 [35]
 In determining whether or not a defendant, or any other person, was a member of a conspiracy, the jury are not to consider what others may have said or done. That is to say, the membership of a defendant, or any other person, in a conspiracy, must be established by the evidence in the case as to his own conduct, what he himself willfully said or did
 In your consideration of the evidence in the case as to the offense of conspiracy charged, you should first determine whether or not the conspiracy existed, as alleged in the indictment. If you conclude that a conspiracy did exist, you should next determine whether or not the accused willfully became a member of the conspiracy.
 If it appears beyond a reasonable doubt from the evidence in the case that the conspiracy alleged in the indictment was willfully formed; and that the accused willfully became a member of the conspiracy, either at the inception or beginning of the plan or scheme, or afterwards; that by his words and actions, the accused objectively manifested an agreement to participate, directly or indirectly, in conducting the affairs of the enterprise through a pattern of racketeering activity, that is to say, by agreeing to participate, directly or indirectly, in two or more acts of racketeering activity; and thereafter, that one or more of the conspirators knowingly committed, in the furtherance of some object or purpose of the conspiracy, one or more of the overt acts charged; then the success or failure of the conspiracy to accomplish the common object or purpose is immaterial.
 In summary, four essential elements are required to be proved in order to establish the offense of conspiracy charged in the indictment:
 First: that the conspiracy charged in the indictment was willfully formed, and was existing at or about the time alleged;
 Second: That the accused willfully became a member of the conspiracy, that is, he objectively manifested, by his word or actions, an agreement to participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as hereinafter defined, that is, by agreeing to participate, directly or indirectly, in two or more acts of racketeering activity.
 The object and purpose of the conspiracy charged in Count One and the substantive or completed offense charged in Count Two is the conduct of the affairs of an enterprise, in this case the Sheriff's office, through a pattern of racketeering activity.
 Racketeering activity means certain acts in violation of the laws of the United States or the State of Mississippi, and in this case means: . . .
 A "pattern of racketeering activity" means at least two acts of racketeering activity committed within ten years of each other. Therefore, in order to find a particular defendant guilty under Count Two, you must find beyond a reasonable doubt that he participated in at least two acts of racketeering activity during the period set fourth in Count Two. (T. 4503-08).
 Now, each of the defendants, charged in each count, is entitled to your separate consideration as to whether he is guilty or innocent as to that count.
 Each count and the guilt or innocence of each defendant with respect thereto must be considered by you separately and independently of another count and another defendant.
 The defendants, though being tried together, are each entitled to the same kind of consideration on your part as if he were being tried alone. You may not assume that all are either guilty or not guilty simply because they are tried together. It is your duty to give separate, personal consideration to the case of each individual defendant.
 When you do so, you should analyze what the evidence in the case shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendants or defendant. Each defendant is entitled to have his case determined from the evidence as to his own acts, and statements, and conduct, and any other evidence in the case which may be applicable to him under the instructions I have given you in connection with the case (T. 4514-15).
 In order to aid and abet another to commit a crime it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it as he would in something he wishes to bring about; that is to say, that he willfully seek by some act or omission of his to make the criminal venture succeed.
 The mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish that the defendant aided and abetted the crime, unless you find beyond reasonable doubt that the defendant was a participant and not merely a knowing spectator (T. 4531).
 
 
 [36]
 The Harbins requested a charge that "to convict on the basis of circumstantial evidence requires a finding that all other reasonable hypotheses than guilt are excluded."
 
 
 [37]
 There are two types of evidence from which a jury may properly find a defendant guilty of a crime. One is direct evidence such as the testimony of an eyewitness. The other is circumstantial evidence the proof of a chain of circumstances pointing to the commission of the offense
 As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case.
 T. 4492.
 
 
 [38]
 This issue is raised by Hamilton, Harter, the Harbins and Chaney
 
 
 [39]
 Additionally, the Harbins contend the government committed error in its closing arguments by treating them jointly rather than as individuals. Specifically, they object to the following statement: "In fact, if you get down to analyzing the evidence, there is no evidence whatsoever that suggest to you that there was even two businesses there." Vol. II, pp. 286-87. The Harbins contend this statement required the jury to find they were acting in concert. We do not so read the statement and, further, find it to be fair argument from the evidence which suggested the Harbins worked closely together with few people perceiving there to be two businesses
 
 
 [40]
 Under the rules established by the trial judge, during closing arguments counsel could object but were not to state the reason for the objection. After the first argument by government counsel, all the attorneys retired to chambers and the defense made a motion in limine to prevent the government from making any future references to the fact that the defendants did not testify. Because we hold the statements by the government were not improper, we necessarily hold the denial of the motion in limine was not error
 
 
 [41]
 The comments at issue are the italicized portions of the segment of the closing argument reprinted below
 MR. HAILMAN:
 After Weatherly introduced Kellum to Harter, then Harter became his man and they then cut Weatherly out. And Harter took Kellum to the Sheriff. And they sat in the Sheriff's car I'm sorry, they sat in Harter's car, out in the driveway of Harter's house. And for the first time they talked about payoffs. And you recall the Sheriff's voice and the way he talked about it. And we ask you, ladies and gentlemen, whether you think the Sheriff was investigating Kellum or whether Kellum was investigating the Sheriff. If the Sheriff was investigating Kellum, and Les Davis, and Gino Stephens, then where is his proof, where are his serial numbers, where are the photographs, where is one thing
 MR. GILDER:
 I object, Your Honor.
 THE COURT:
 The objection is overruled. I say, the objection is overruled.
 MR. HAILMAN:
 All right.
 Where is one piece of evidence to support the theory put forward by defense counsel that the Sheriff was investigating these police officers and FBI agents? There is not one piece of evidence in this case. There were a few questions asked by the attorney is it possible this, is it possible that. But you ladies and gentlemen are to consider the evidence testimony, documents, photographs, tapes. There is nothing but a theory and a suggestion.
 I will not go through in detail all of Sergeant Kellum's testimony. It is too long. I think you remember the basics of it. How he met the Sheriff. And you heard, in the Sheriff's own words and in his own voice, the discussions that they had.
 You will recall that after a certain point in time they met one night, on October the 29th, to look at club property. And Harter told Kellum that he, himself, said he wasn't getting any money out of this and he wanted to open a tonk of his own. He had a man that would do it, and he needed some money. Kellum gave him $500, and Harter accepted it gladly. Kellum gave him another $200 to give to the Sheriff. He took that too. If they were investigating Kellum, thought he was a gangster, where is that money ? Why was there no complaint to the FBI? Why didn't the District Attorney hear about it?
 MR. GILDER:
 Objection, Your Honor, again.
 THE COURT:
 The objection is overruled.
 MR. HAILMAN:
 You recall the FBI and the Memphis Police Department began to work together. They decided that they would pose as gangsters and open up a club. And they did. They rented the old American Legion Building, which they renamed the Pump House, which was going to be sort of a beer joint, with call girls, and gambling, gambling machines. When they opened the Pump House, the Sheriff welcomed them with open arms.
 You recall that on November the 9th, they decided that they needed to start working Kellum out of the operation because he was local and somebody might recognize him. They wanted to bring in some other people and make the operation a little more legitimate, so they got FBI Agent Gene Stephens. You recall him, a tall, imposing looking FBI Agent, to come on, and he posed as "Gino".
 You recall the Sheriff was investigating this man so hard he didn't even ask him his last name. He didn't know where he was from, what he did, or anything. But he said he appeared to be a gangster. And you ladies and gentlemen will recall Mr. Stephens. He is a fine man, and FBI agent, but he could look like a gangster pretty easy. He was a tough looking fellow.
 Well, the next day the Sheriff was to come back to the motel, and they were to get their arrangements straight on the payoffs, but the Sheriff didn't come. He called and said Harter is going to come in my place. So, Mr. Harter shows up. And the agents wanted to be sure of the evidence on Sheriff Hamilton, and he said, "Let's do it this way. Let's verify the payoff." So they had Mr. Harter dial Sheriff Hamilton's number. Sheriff Hamilton answered the phone down in Hernando at the Sheriff's office. Stephens got on the phone and stood by Harter, and pulled out five $100 bills and said, "All right, Sheriff, I am giving him the money now, this is $500, right?" The Sheriff said, "Right". He said, "All right, one, two, three, four, five". He counts it out and puts it in Harter's hand. If that is not direct evidence, it is hard to imagine direct, hard evidence of bribery and payoffs, and official corruption.
 If the Sheriff had been investigating Stephens as a gangster, those five $100 bills would have been brought in here and shown to you ladies and gentlemen.
 MR. GILDER:
 Objection, Your Honor. Can we make a motion, Your Honor?
 THE COURT:
 The objection is overruled. I will permit you to make a motion at the close of his argument.
 MR. HAILMAN:
 You recall the last two witnesses. FBI Agent Orrin Fuelling from Jackson. He testified that while checking Sheriff Hamilton's house, after he removed some boxes off of a closet shelf he saw a $10 bill lying there, and he picked it up, and he put it in an evidence envelope. And they kept it, and later it was compared to the serial numbers on the last list of payoff serial numbers from Fran Jenkins, and it matched; that is, it was a $10 bill that Fran Jenkins gave Jack Briggs, and it shows up in Harvey Hamilton's closet. There is only one conclusion you can draw from that, that is, where the payoffs were going.
 The defense has made some suggestions on the amusing side, saying that perhaps this was a counterfeit bill, that the Treasury Department never issued it. There is no way those numbers could match unless that was a bill that Fran Jenkins gave to Jack Briggs, and from Jack Briggs' hands it went to the hands of Harvey Hamilton. They dispute it. They say it had no fingerprints. But in this case they didn't need fingerprints. It was in his house. It was right there. And the agents said fingerprints don't always take on a dollar bill. They might be there but they smudge. There were no identifiable fingerprints.
 Even stronger corroboration was the testimony of Agent Graves, when he was searching the house of Sheriff Hamilton. And they found three purses in the dining room. And he went into the kitchen to ask Mrs. Hamilton to take the money out. And when she took the money out there was a $20 bill in there, and when it was matched up with the serial nubers (sic) provided by Fran Jenkins, it matched perfectly. That was a bill that Fran Jenkins gave Jack Briggs on June the 8th, 1977, as part of a $300 payoff, and it ended up in Mrs. Hamilton's purse. And you ladies and gentlemen know from the testimony in this case that Mrs. Hamilton is too nice a lady to have known anything about that. And the only way that that $20 bill got in that purse was because Sheriff Hamilton got that money and he gave it to her for groceries, or for spending money. And that is where that bill came from. There is no other reasonable explanation or conclusion that can be drawn from that evidence.
 Members of the jury, the defense made you a number of promises in their opening statements as to what would happen in this case. They said they would show you that Ed Osborne caused all of this.
 MR. FARESE:
 Objection, Your Honor.
 THE COURT:
 Yes, I believe I will sustain the objection as to what was said in the opening statements.
 Ladies and gentlemen of the jury, it is not incumbent upon the defendants in this case to produce any evidence or testify themselves. They may rely upon the testimony produced by the government. They are not called upon to make any explanation or introduce any proof. They have a constitutional right to do that, and it is not to be held against them in this case.
 I am going to sustain the objection to that particular line of argument.
 Earlier in his argument Mr. Hailman stated:
 MR. HAILMAN:
 If you ladies and gentlemen recall the testimony different from me, by all means don't take my word for it, take your own memory as to what the truth was.
 You recall that in this period May 21st, 1976, Agent Tichenor assigned Special Agent Joe Lattus you remember the tall FBI agent who testified earlier in the case, who testified very briefly. He was afraid he might be recognized. He assigned Lattus to go to Bob and Marilyn's Restuarant (sic), which was on the corner of a little shopping center, right down just a hundred feet or so from where the Camelot Massage Parlor was, and he told him to watch for Fran Jenkins, see who she met and what they did. And, sure enough, Fran Jenkins came up with Mr. Harbin, the father. Mr. Lattus followed him out, and when they got out on the sidewalk, Fran Jenkins handed him a roll of bills. Now, what that roll of bills was for has never been explained. And I suggest to you that the only reasonable conclusion is that that was one of the payoffs that Harbin had told Campbell he was picking up for Hamilton. And that was the instance where Harbin was so afraid they were going to catch him, they were going to see him. Maybe he was being set up, and he didn't know why she would hand him the money right out in the open. Of course he
 MR. BURGLASS:
 I object. The government counsel continually personalizes what he believes to be true, and it is improper.
 THE COURT:
 The objection is overruled.
 MR. HAILMAN:
 Members of the jury, I am not telling you what to believe is true. I am just trying to say what I believe I recall from the testimony. I don't mean to mislead you.
 THE COURT:
 You cannot argue what your belief is from the testimony, but you can argue to the jury what reasonable inferences can flow your argument about the reasonable inferences that could flow from the testimony received in the case.
 MR. HAILMAN:
 Yes, sir.
 MR. BURGLASS:
 Your Honor, my objection goes further. We don't have to explain it.
 THE COURT:
 The objection is overruled.
 MR. BURGLASS:
 Yes, sir.
 THE COURT:
 You may proceed.
 Later during closing arguments, Assistant United States Attorney Moreton argued:
 Mr. Gilder said, where are the serial numbers on the bills paid to Hamilton and Harter? They are still on the bills, and if they had had those bills, were holding them for evidence, they could have presented them to them right there on the witness stand. In other words, you know, the question was raised, did you write down the serial numbers. And then on the other hand they were suggesting at the same time that they were collecting this evidence against the undercover agents and officers. Now, if the officers didn't write the serial numbers down, but if they collected the bills with the serial numbers on them, all they would have to do is present the bills there.
 
 
 [42]
 We submit that the overwhelming evidence in this case, and the almost uncontradicted evidence in the case, certainly warrants
 (Defense objection overruled.)
 warrants conviction. But if I have misstated that, then you consider that just a statement of counsel. The Court will instruct you on the law. And one of the instructions the Court will give you is that statements of the lawyers are not evidence, and questions of the lawyers are not evidence, but it is the answers that make the evidence.
 
 
 [43]
 Effect on interstate commerce must also be proven, but no defendant has contended that is an issue in this case. Accordingly, we do not discuss it. "Racketeering activity" includes any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is a felony under State law, and any of several enumerated federal crimes. 18 U.S.C. § 1961(1)
 
 
 [44]
 For a discussion of the applicability of RICO to governmental entities, see Note, The Racketeer Influenced and Corrupt Organizations Act: An Analysis of the Confusion in its Application and a Proposal for Reform, 33 Vand.L.Rev. 441, 469-76 (1980) (hereinafter Vanderbilt Note)
 
 
 [45]
 A careful reading of Count II reveals that it alleges that the defendants are responsible for the RICO violation both as principals and as aiders and abettors. There is sufficient evidence to sustain their convictions as principals. We need not decide whether they aided and abetted each other as well, because aiders and abettors are punishable as principals. 18 U.S.C. § 2. See United States v. Bell, 457 F.2d 1231, 1235 (5th Cir. 1972)
 
 
 [46]
 There was some conflict in the testimony as to whether Bright was paying thirty percent or one-third of his premiums to Hamilton
 
 
 [47]
 "(P)attern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity
 While in this case the predicate crimes are related both to each other and to the affairs of the enterprise, such need not be the case to satisfy the "pattern" requirement. In United States v. Elliott, 571 F.2d 880, 899 n. 23 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), this court took the position that the predicate crimes need only be related to the affairs of the enterprise they need not be related to each other. For a discussion approving of this view, see Blakey & Goldstock, "On the Waterfront": RICO and Labor Racketeering, 17 Am.Crim.L.Rev. 341, 354-55 (1980). Contra United States v. White, 386 F.Supp. 882 (E.D.Wis.1974); United States v. Stofsky, 409 F.Supp. 609, 614 (S.D.N.Y.1973), aff'd, 527 F.2d 237 (2d Cir. 1975). See also Vanderbilt Note, supra, note 44, at 450-53.
 
 
 [48]
 The admissibility of the disputed tapes is discussed at pp. 819-821, supra
 
 
 [49]
 Moreover, we find that the fact that the Harbins did not have exclusive control is not relevant to Count I either. In Count I it was alleged that
 It was part of the conspiracy that all owners of amusement and gambling machines in DeSoto County would be forced out of business and that the amusement and gambling machine business in DeSoto County would be controlled exclusively by persons chosen by Harvey Hamilton, who would make regular payoffs to Harvey Hamilton in return for the exclusive right to own and control amusement and gambling machines in DeSoto County.
 The fact that the alleged exclusivity goal was never realized does not mean that was not a goal of the enterprise. Accordingly, it was not necessary that the government prove that, in fact, exclusivity was achieved.
 
 
 [50]
 We note that evidence was admissible as a statement made by a co-conspirator during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E)
 
 
 [51]
 That one predicate crime was extortion and another bribery causes us no pause. Initially, we note that there is sufficient evidence that Harbin-father and Harbin-son were engaged in a continuous bribery relationship with Hamilton. However, even if there was only one act of bribery, that, in conjunction with the act of extortion is sufficient to sustain a RICO conviction. See United States v. Elliott, 571 F.2d at 899 n.23. See also United States v. Diecidue, 603 F.2d 535 (5th Cir. 1979), cert. denied, --- U.S. ----, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980)
 
 
 [52]
 We are aware that the enterprise conspiracy is designed to avoid the pitfalls of traditional conspiracy law which results in a criminal enterprise being viewed as several small conspiracies rather than one large conspiracy because of different goals and different participants. E. g., Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). However, we are also cognizant of the fact that the RICO conspiracy crime still requires an agreement. The converse of the proposition that a defendant who embarks on a criminal venture of indefinite outline takes his chances as to its contents and membership, United States v. Elliott, 571 F.2d at 904, is that one who embarks on a criminal venture with a circumscribed outline is not responsible for acts of his co-conspirator which are beyond the goals as the defendant understands them. United States v. Andolschek, 142 F.2d 503, 507 (2d Cir. 1944)
 
 
 [53]
 Section 1951 of 18 U.S.C. provides:
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section
 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.